FILED
Sep 19 2017, 8:22 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Victoria L. Bailey
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Racquel Postiglione,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 19, 2017<br><br>Court of Appeals Case No.<br>49A04-1607-CR-1662<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark D. Stoner, Judge<br><br>Trial Court Cause No.<br>49G06-1504-F5-14728 |

**Pyle, Judge.**

## Statement of the Case

[1]     Racquel Postiglione ("Postiglione") appeals the trial court's restitution order

entered following her conviction for Class A misdemeanor battery resulting in

bodily injury.[1]  Postiglione argues that the trial court abused its discretion by ordering her to pay $18,451.33 in restitution to the victim, contending that she did not cause the victim's injuries for which restitution was ordered. Concluding that, in light of the facts and circumstances of this case, there was evidence and reasonable inferences therefrom to show that the victim incurred medical costs as a result of Postiglione's crime, we find no abuse of discretion and affirm the trial court's order of restitution.

We affirm.

# Issue

> Whether the trial court abused its discretion by ordering Postiglione to pay $18,451.33 in restitution to the victim.

# Facts

Around 1:00 a.m. on April 24, 2015, Postiglione and three male friends, including her boyfriend, Christopher Shafer ("Christopher"),[2] and his brother, Michael Shafer ("Michael"), went into the Alley Cat bar ("the bar") in Broad Ripple.  Postiglione and her companions had already consumed varying levels of alcohol prior to arriving at the bar.  The bartender, Matthew Marcuccilli ("Marcuccilli"), noticed Postiglione and the others as they walked in the bar because they were "very loud" and "clearly intoxicated."  (Tr. Vol. 2 at 13). Marcuccilli "immediately decided not to serve them" any alcohol and instead

---

[1] IND. CODE § 35-42-2-1.

[2] During the trial, some of the witnesses referred to Christopher as Nicholas or Nick.

served them water. (Tr. Vol. 2 at 13). Marcuccilli considered Postiglione to be "the rudest" of the group as she was "screaming profanities" and "[s]lurs" and "bothering" customers. (Tr. Vol. 2 at 14). After Postiglione and the others caused multiple "confrontations" and "squabbles" with other customers, Marcuccilli asked them to leave the bar. (Tr. Vol. 2 at 18). They, however, "kept sneaking back in" the bar, and Marcuccilli asked them to leave another three times. (Tr. Vol. 2 at 20).

[4] Eventually, Marcuccilli, with a small, wooden bat in hand, hit the bat on the bar and threatened to call the police if Postiglione and her friends did not permanently leave the bar. Marcuccilli signaled to Joe Kelly ("Kelly"), who worked across the street from the bar and was a regular customer, that he needed help in getting Postiglione and her friends to leave the bar. Marcuccilli, with Kelly behind him, walked Postiglione and her friends to the door. As Postiglione walked out, she yelled, "I'll kick that white bitch's ass[,]" referencing another female customer. (Tr. Vol. 2 at 52). Once Postiglione and the others were out the door and had walked down the alley, Marcuccilli returned to the bar to work, and Kelly stood in the doorway for several minutes.

[5] Shortly thereafter, Michael came back to the door of the bar, and Kelly, who was still in the doorway, directed him back into the alley. Kelly walked Michael down the alley near a dumpster, and Michael "took off running" towards his two male companions. (Tr. Vol. 2 at 77). Postiglione then came out from behind the dumpster, "got in [Kelly's] face[,]" and started "screaming" at him. (Tr. Vol. 2 at 77). Postiglione grabbed Kelly's beard with

both hands, put her feet on his thighs, and tried to "rip [his] beard out." (Tr. Vol. 2 at 78). Kelly, who felt "extreme[] pain[]," grabbed the top of his beard so Postiglione would not rip it out. (Tr. Vol. 2 at 78). In an attempt to get Postiglione to let go of his beard, he grabbed, but did not pull, Postiglione's hair and threatened to "rip her hair out" if she did not let go of his beard. (Tr. Vol. 2 at 78). Michael and Christopher came up and tried to pull Postiglione and Kelly apart and then repeatedly punched Kelly. Kelly did not punch back or hit anyone. As Postiglione was "latched onto" Kelly and the others were pulling on them, Kelly "lost his balance[,]" fell to the ground, and broke his leg. (Tr. Vol. 2 at 101). As Kelly was on the ground, Christopher kicked him in the face and Michael "stomped" multiple times on Kelly's ankle, causing it to break. (Tr. Vol. 2 at 79). Postiglione and the others laughed at him and told him that he was going to jail.

[6] Eventually, an employee of the bar, Maurice James ("James"), arrived in the alley and pulled Michael off Kelly. James heard Postiglione yelling, "trailer trash" and thought he saw her "kicking [Kelly] in his legs" while he was on the ground. (Tr. Vol. 2 at 140-41). Kelly was unable to walk and struggled to sit up against a fence. As he did so, he felt that "both places on [his] leg were definitely hurting very bad[ly]." (Tr. Vol. 2 at 79). Thereafter, the police arrived and arrested Postiglione and Christopher but not Michael because he had run away. Postiglione was "verbally combative" with the police and gave "smart aleck remarks." (Tr. Vol. 2 at 166). Kelly was taken to the hospital. He

suffered a broken leg, a broken ankle, and abrasions on his face. Kelly later had a surgery to insert two screws in his ankle.

[7] The State jointly charged Postiglione, Michael, and Christopher with Level 5 felony battery resulting in serious bodily injury. Specifically, the State alleged that the serious bodily injury was a broken bone in Kelly's left leg.

[8] In May 2016, the trial court held a bench trial, in which Postiglione and her co-defendants were tried jointly. The State presented testimony from Marcuccilli and Kelly regarding the facts above. It also presented testimony from other bar employees and the responding police officers.

[9] Postiglione testified on her own behalf. She acknowledged that she had verbally argued with another customer and that she had used "combative speech." (Tr. Vol. 2 at 240). She admitted that she had been asked to leave the bar but denied that she had been escorted out of the bar. Postiglione also denied that she had hit or kicked Kelly's leg. Her defense at trial was that Kelly was the initial aggressor and that she had acted in self-defense. Specifically, she testified that Kelly had yelled "slurs" at her from down the alley and that she had yelled back at him. (Tr. Vol. 2 at 243). She also testified that, as Kelly had gotten closer to her, he had "spit at [her], kind of like a sprinkler[.]" (Tr. Vol. 2 at 243). Postiglione testified that Kelly had spit at her three or four times "to get a rise out of [her]" and "to provoke" her. (Tr. Vol. 2 at 243-44). Additionally, she testified that Kelly had hit her jaw with an "open fist" and opined that Kelly had "knowingly just hit [her] enough to knock [her] off [her]

feet a bit." (Tr. Vol. 2 at 244). Postiglione testified that Kelly had also delivered "a blow to the back of [her] head[.]" (Tr. Vol. 2 at 244). Postiglione's counsel argued that Kelly was mad at Postiglione because she was an outsider at the bar and had gotten into an argument with a regular customer and that Postiglione was not the initial aggressor.[3]

[10] Before entering its verdict, the trial judge stated that "in listening to this case, . . . it. . . [was] pretty clear . . . that this [wa]sn't one which you c[ould] find a whole lot of nuance or come up with some Solomonic resolution as to what [had] really happened." (Tr. Vol. 3 at 72). He added that it had "been a while since [he had] heard a court trial in which one side or the other [had] clearly lied to the Court." (Tr. Vol. 3 at 72). The trial judge further stated that "out of the people that [had] testified, [he] [had] believed [Postiglione] the least." (Tr. Vol. 3 at 72). The judge elaborated that it had "been a while since [he'd] had somebody come in and try to snow the Court as much as they ha[d] with extra verbiage and not answering things, and put[ting] things a particular way." (Tr. Vol. 3 at 72). The trial judge pointed out that the existence of Kelly's injuries was "undisputed" but that the dispute rested in "[h]ow they [had] occurred[.]" (Tr. Vol. 3 at 72). The judge stated that it was clear that Postiglione and Kelly were "engaged in mutual combat" but stated that she was not the person who had "inflicted the blows to the extent of the damage[.]" (Tr. Vol. 3 at 75). The

---

[3] Michael's defense was also self-defense. He testified that he did not want to fight Kelly and that he had engaged Kelly because he was trying to protect Postiglione from Kelly, who—according to Michael's testimony—had grabbed her and had thrown her on the ground. Michael also denied that he had stomped on Kelly's ankle. Christopher's defense was that he was not involved in the situation between Postiglione and Kelly.

trial court found Postiglione guilty of the lesser-included offense of Class A misdemeanor battery. The judge stated that Michael and Christopher were "defending the person with the mouth" and found them not guilty. (Tr. Vol. 3 at 74-75).

[11] During the sentencing hearing, the parties disagreed about how restitution should be handled. The State introduced: (1) State's Sentencing Exhibit 1, a restitution statement from the Indiana Criminal Justice Institute to show that it had paid $15,000.00 from the Violent Crime Compensation Fund toward Kelly's medical bills; and (2) State's Sentencing Exhibit 2, a list of Kelly's medical bills totaling $33,451.33. State's Exhibit 2 included medical bills, from varied dates, for the following: ambulance services; radiology services; crutches; anesthesia services; and hospital services. Kelly testified that he had had one surgery for his injuries and that it had taken him approximately six months to recover from his injuries.

[12] Postiglione's counsel argued that Postiglione should not have to pay the restitution requested because Kelly's medical bills were a result of his broken leg, and Postiglione "did not cause the broken leg." (Tr. Vol. 3 at 93). Her counsel also argued that the trial court, by convicting Postiglione of the lesser included misdemeanor battery, had determined that she was not "responsible for the broken leg." (Tr. Vol. 3 at 93). Postiglione's counsel, however, acknowledged that Kelly could seek restitution in civil court.

[13] The State responded the restitution was proper because Postiglione was found guilty of battery causing bodily injury to Kelly. Citing to *Lowden v. State*, 51 N.E.3d 1220 (Ind. Ct. App. 2016), *trans. denied*, the State argued that the injury to Kelly did not have to be foreseeable and that, because Postiglione was found guilty of battery, she was responsible for any injury that resulted from her crime.[4]

[14] The trial court acknowledged the State had originally charged Postiglione with battery resulting in serious bodily injury and that the court had found her guilty of battery resulting in bodily injury. At the end of the hearing, the trial court took the matter of restitution under advisement. The trial court then imposed a one (1) year sentence suspended to non-reporting probation, and it ordered Postiglione to complete 100 hours of community service.

[15] Thereafter, the trial court entered its restitution order and ordered Postiglione to pay $18,451.33 in restitution to Kelly. Specifically, the trial court determined that Kelly had incurred $33,451.33 in medical expenses, noted that Kelly had received $15,000.00 from the Indiana Criminal Justice Institute's Violent Crime Compensation Fund, and ordered Postiglione to pay the remaining $18,451.33

---

[4] In *Lowden*, our Court reviewed the aggravated battery statute when addressing the defendant's jury instruction argument. Specifically, the defendant argued that the State was required to prove that the defendant "knew his conduct would lead to serious bodily injury." *Lowden*, 51 N.E.3d at 1222. We rejected the defendant's argument and held that "the severity of the injury [wa]s not an element of the prohibited conduct, but a result of it." *Id.* at 1223. We explained that, "the State was required to prove only that [the defendant] knowingly or intentionally inflicted injury upon [the victim] and not that [the defendant] knew he would cause serious bodily injury." *Id.*

in restitution to Kelly. In its order, the trial court gave the following "support of its ruling[:]"

> 1. [Postiglione] was found guilty of battery, a [C]lass [A] misdemeanor, for physically striking Joseph Kelly. The Court made the equitable ruling of not convicting [Postiglione] of the more serious Class C [sic] felony battery resulting in serious bodily injury, because the evidence suggested these injuries were more likely inflicted by [Postiglione's] co-defendants, Christopher Schafer and Michael Schafer.
>
> 2. The battery committed by [Postiglione], however, started the fracas and the codefendants['] actions were not a separate, intervening action which might have removed [Postiglione's] responsibility for restitution.
>
> 3. The injuries sustained by Joseph Kelly were reasonably foreseeable and a direct consequence of the acts initiated by [Postiglione].

(App. Vol. 2 at 6). Postiglione now appeals.

# Decision

[16] Postiglione argues that the trial court abused its discretion by ordering her to pay $18,451.33 in restitution to Kelly, contending that she did not directly cause Kelly's injury for which he sought restitution.

[17] Pursuant to the restitution statute, INDIANA CODE § 35-50-5-3, a trial court has authority to "order [a defendant] to make restitution to the *victim of the crime*[.]" IND. CODE § 35-50-5-3(a) (emphasis added). The trial court "shall base its restitution order upon a consideration of . . . [among other things,] . . . medical and hospital costs incurred by the victim (before the date of sentencing) *as a*

*result of the crime*[.]" I.C. § 35-50-5-3(a)(2) (emphasis added). "Although the [restitution] statute does not define the term 'victim,' [the Indiana Supreme] Court has held that restitution is properly payable to 'those shown to have suffered injury, harm or loss as a direct and immediate result of the criminal acts of a defendant.'" *Sickels v. State*, 982 N.E.2d 1010, 1013 (Ind. 2013) (quoting *Reinbold v. State*, 555 N.E.2d 463, 470 (Ind. 1990), *overruled in part on other grounds by Wright v. State*, 658 N.E.2d 563 (Ind. 1995)).

[18] "The principal purpose of restitution is to vindicate the rights of society and to impress upon the defendant the magnitude of the loss the crime has caused." *Pearson v. State*, 883 N.E.2d 770, 772 (Ind. 2008), *reh'g denied*. "Restitution also serves to compensate the offender's victim." *Id.* An order of restitution lies within the trial court's discretion and will be reversed only where there has been an abuse of discretion. *Kays v. State*, 963 N.E.2d 507, 509 (Ind. 2012). A "trial court abuses its discretion in ordering restitution 'only if no evidence *or reasonable inferences therefrom* support the trial court's decision[.]'" *Archer v. State*, --N.E.3d--, 2017 WL 3882430, *3 (Ind. Sept. 6, 2017) (quoting *Little v. State*, 839 N.E.2d 807, 809 (Ind. Ct. App. 2005)) (emphasis added by *Archer*).

[19] Postiglione does not challenge her Class A misdemeanor battery conviction; thus, she does not dispute that she knowingly or intentionally touched Kelly in a rude, insolent, or angry manner, resulting in bodily injury to Kelly. *See* I.C. § 35-42-2-1. She also does not dispute that: (1) Kelly sustained injuries in his encounter with Postiglione and her co-defendants; (2) Kelly incurred medical bills totaling $33,451.33 as a result of his injuries; and (3) the State presented

evidence to show that he had incurred those medical bills. Instead, Postiglione suggests that Kelly's medical costs were all related to Kelly's broken ankle injury and his surgery for that ankle fracture, and she contends that "the State failed to present sufficient evidence to prove that [she] caused the injury to Mr. Kelly [that] required him to have surgery." (Postiglione's Br. 7). She asserts that Kelly's ankle injury was caused by Michael stomping on it and contends that there was "no evidence that [her] criminal conduct caused Michael to stomp repeatedly on Mr. Kelly's ankle[.]" (Postiglione's Br. 9). She seems to argue that Kelly could not be considered her victim because she did not directly or solely cause his specific ankle injury.

[20] Postiglione, however, ignores the fact that Kelly had a broken leg in addition to a broken ankle and that Kelly broke his leg as he fell to the ground with Postiglione latched onto him. Furthermore, the medical bills included in State's Exhibit 2 included medical bills that were related to all of Kelly's injuries. These medical bills, which were incurred on various dates, included ambulance services, radiology services, crutches, anesthesia services, and hospital services.

[21] More importantly, the restitution statute and case law do not require that a victim's injury or loss be directly or solely "caused" by a defendant; instead, they require the victim's injury or loss be a "result of" the defendant's crime. *See, e.g.*, I.C. § 35-50-5-3(a)(2); *Archer*, 2017 WL 3882430 at *3; *Sickels*, 982 N.E.2d at 1013.

[22] Our supreme court has explained that "the word 'victim' in the statutes authorizing restitution has not been construed so narrowly as to limit the payment of restitution only to the person or entity actually subjected to the commission of the crime" and further explained that a victim could include third parties, such as survivors of a murder victim, as long as they had "shown to have suffered injury, harm or loss as a direct and immediate result of the criminal acts of a defendant." *Reinbold*, 555 N.E.2d at 470. In *Reinbold*, our supreme court held that the trial court had acted within its discretion when it ordered a defendant to pay the victim's "funeral and burial expenses incurred by [the victim's] family, as well a figure designated as child support for the two minor children [the victim had] left." *Id.* at 471. The *Reinbold* Court held that "[t]hese monetary losses born by these parties were *the result of appellant's criminal acts*, and the trial court [had] acted within its statutory authority when ordering restitution for their recompense." *Id.* (emphasis added).

[23] More recently, in *Archer*, our supreme court reviewed the issue of restitution and the evidence necessary to support a trial court's restitution order. *Archer*, 2017 WL 3882430 at *3. In that case, a defendant stole a car, and, when the car was found five hours later, it had some damage and red paint on various places on the car. *Id.* at *1. The defendant pled guilty to auto theft, and the trial court ordered her to pay $5,240.32 in restitution to the victim for the spray-paint damage to the victim's car. *Id.* On direct appeal, the defendant argued that the trial court had abused its discretion by ordering her to pay restitution because there was no evidence to show that the defendant "herself [had been]

the one who [had] spray-painted the victim's vehicle." *Id.* at *3. Another panel of our Court agreed and held, among other things, that "insufficient evidence supported the restitution order because the record did not show that the spray-paint damage was attributable to the theft." *Id.* at *2. Our Indiana Supreme Court granted transfer and affirmed the trial court's restitution order. *Id.* at *3. The *Archer* Court explained that appellate courts may find an abuse of discretion in a trial court's restitution order "only if no evidence *or reasonable inferences therefrom* support the trial court's decision[.]" *Id.* (emphasis in original and internal quotation marks and citation omitted). The Archer Court held that reasonable inferences supported the trial court's restitution order at issue and reasoned as follows:

> Here, there is sufficient evidence that the spray-painting is a result of the underlying auto theft. Archer pled guilty to auto theft; that is, she "knowingly exert[ed] unauthorized control over the motor vehicle of [the victim] . . . with the intent to deprive the person of the vehicle's value or use." (App. 16.) The record reveals that [the victim's] vehicle was stolen. When it was recovered five hours later, Archer was driving the vehicle and it had fresh red paint all over its front and sides as well as covering the vehicle's VIN. While it is true that no one testified that Archer was the one who spray-painted the vehicle, it can be reasonably inferred that Archer is responsible for that damage. For instance, it is a reasonable inference that the purpose of the paint was to change the vehicle's appearance and/or conceal the VIN so it would not be recognized as stolen, facilitating the crime. Also, Archer was driving the vehicle only five hours after it was stolen so it is reasonable to infer that Archer was responsible for the painting, even if she wasn't the person who actually sprayed the vehicle. Indeed, Archer stole the vehicle and

is responsible for the damage done to it while it was in her custody and control, including the spray-painting.

*Id.* at *3.

[24] Here, the trial court, when ordering restitution, explained that Postiglione had "started the fracas" and that her "codefendants['] actions were not a separate, intervening action which might have removed [her] responsibility for restitution." (App. Vol. 2 at 6). The trial court specifically found that Kelly's injuries were a result of or a "direct consequence of the acts initiated by [Postiglione]." (App. Vol. 2 at 6). Based on our supreme court's guidance in *Archer* and the purpose of restitution, we conclude that, in this specific case, the evidence and reasonable inferences therefrom support the trial court's restitution order. Accordingly, we affirm the trial court's restitution order requiring Postiglione to pay $18,451.33 in restitution to Kelly.

[25] Affirmed.

Baker, J., and Mathias, J., concur.